## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

NIMISH GANATRA

             Plaintiff

vs.

WASHTENAW COUNTY
PROSECUTOR'S OFFICE,
and ELI SAVIT

             Defendant

Case No.

Hon.

_____

Nicholas Roumel (P37056)
**ROUMEL LAW**
Attorneys for Plaintiff
4101 Thornoaks Dr.
Ann Arbor, MI 48104
(734) 645-7507
*Nick@Roumel-Law.com*

_____

# COMPLAINT AND JURY DEMAND

Plaintiff Nimish Ganatra, a dedicated career prosecutor employed by Washtenaw County, makes the following complaint against Defendants. He alleges that he was retaliated against for making an ethical complaint against a fellow prosecutor to the Attorney Grievance Commission. His claims lie under the First Amendment, Michigan's Whistleblower's Protection Act, and anti-discrimination laws promulgated by the State of Michigan and the United States.

## PARTIES/JURISDICTION/ VENUE

1.      Plaintiff Nimish Ganatra is a resident of Ann Arbor, Washtenaw County, Michigan.

2.      Defendant Washtenaw County Prosecutor's Office ("Prosecutor's Office") is a division of the County of Washtenaw, the public body of local government that employed Mr. Ganatra.

3.      Defendant Eli Savit ("Mr. Savit") was elected Prosecutor of Washtenaw County in November 2020 and took office January 1, 2021. He is sued in his official and individual capacities.

4.      Victoria Burton-Harris ("Ms. Burton-Harris") is the Chief Assistant Prosecutor of Washtenaw County. She was appointed to that position January 1, 2021, by Mr. Savit. She is not a defendant. On information and belief, her actions as described in this complaint were at the behest of Defendant Savit. Should discovery reveal that is not true, Plaintiff will seek amendment of the complaint to relate back.

5.      The events described in this lawsuit arise out of Plaintiff's employment with the Prosecutor's Office, as well as his private conduct in filing a complaint with the Attorney Grievance Commission, and took place chiefly in Washtenaw County.

6.      The federal claims asserted are based on violations of 42 USC § 1983 for deprivation of Plaintiff's right to freedom of speech under the First Amendment to the United States Constitution.

7.     Plaintiff filed a charge of discrimination (on the basis of race/color) with the Equal Employment Opportunity Commission (EEOC), and received a Right to Sue letter from the EEOC dated May 12, 2025.

8.     The state claims asserted arise under Michigan's Whistleblower Protection Act, MCL § 15.361 for retaliation for making a complaint to an official state agency, and for race/color discrimination under Elliott-Larsen Civil Rights Act, M.C.L. 37.2201 *et seq*.

9.     This Court has subject matter jurisdiction over federal claims pursuant to 28 USC § 1331 and over state law claims pursuant to 28 USC § 1367.

10.     Venue lies within the Eastern District of Michigan pursuant to 28 USC § 1391, as it is the district in which the events giving rise to Plaintiff's claims took place.

11.     This complaint is timely pursuant to two separate tolling agreements between the parties dated March 3 and August 12, 2025, the latter of which expires on September 30, 2025.

**FACTUAL ALLEGATIONS**

12.     Mr. Ganatra is a native of Michigan, and raised in Ann Arbor. He is a 1997 graduate of the University of Michigan, a 2000 graduate of Wayne State Law School, and has since dedicated his career to criminal prosecution.

13.     He served as an assistant prosecutor in the Washtenaw County Prosecutor's Office from 2001-2009 under then-Prosecutor Brian Mackie. He began by handling domestic violence cases and moved up to prosecute all felonies including homicides. His numerous accomplishments include helping to create and implement the Sobriety Court for Ann Arbor's 15th District Court.

14.     In 2009 Mr. Ganatra moved to Massachusetts, where he founded and supervised the Worcester District Attorney's Domestic Violence Unit, while serving as assistant prosecutor.

15.     Mr. Ganatra voluntarily left that position in 2010 to relocate to Michigan, where he took a position as an assistant prosecutor with Jackson County, handling felony cases, including homicides. He conducted 22 felony jury trials in 18 months, as well as a successful appeal before the Michigan Court of Appeals.

16.     Prosecutor Mackie rehired Mr. Ganatra in 2012, where he continued with felony prosecutions in addition to training and mentoring newer attorneys.

17.     After Eli Savit took office in 2021, he reappointed Mr. Ganatra and promoted him to First Assistant Prosecuting Attorney overseeing all felony prosecutions. He earned a second promotion to Senior Assistant, with the overall responsibilities of supervising daily operations of the criminal division. In that position, he supervised all First Assistants (and their respective unit assignments:

circuit court, district court/warrants, appeals, CSC/child abuse, and juvenile), along with handling up to five homicide files and other felony matters.

18.    Mr. Ganatra also serves as Chair of the State Bar of Michigan's Committee on Criminal Jurisprudence and Practice, has a record of publication including a study of cultural dynamics in domestic violence, and was presented with the "Great Guy Award" in Massachusetts in recognition of his work in leading the Worcester District Attorney's Domestic Violence Unit.

19.    Mr. Ganatra has earned a reputation in Washtenaw County for his competence, professionalism, demeanor, and adherence to the highest ethical standards of the legal profession. He is widely respected by his fellow prosecutors, judges, members of the criminal defense bar, and throughout the broader legal community.

20.    The actions that Mr. Ganatra took that give rise to this lawsuit were, typical of him, undertaken only after thoughtful consideration, consultation with trusted legal professionals, and full awareness that it was the right thing to do regardless of the consequences.

21.    These consequences – being stripped of his duties and placed on suspension euphemistically called "administrative leave" – are driven by public officials who are intent on promoting a false narrative of events to justify their illegal actions.

## A Prosecutor Under Mr. Ganatra's Supervision, "Jane Doe," Failed to Provide Critical Information to the Court

22.     One of the assistant prosecutors under Mr. Ganatra's supervision shall be called "Jane Doe."

23.     On September 18, 2024, Ms. Doe authorized a felony warrant against Mr. Don Miguel Lee in case number 24F2-1261/24-859. When Mr. Lee was arraigned on that case, the Magistrate granted a personal recognizance bond so that Mr. Lee would not be required to post money (cash bond) to ensure his appearance at future court events.

24.     Mr. Lee's next hearing was a "probable cause" conference, held before the Hon. J. Cedric Simpson at the 14A1 District Court on September 26, 2024. At that hearing, Ms. Doe requested of Judge Simpson a cash bond for Mr. Lee. This was in contravention of the Prosecutor's Office's typical policy.[1] It was, however, understood that cash bail may still be sought in extraordinary circumstances.

---

[1] **Policy 2021-02: "No Cash Bail" and Pretrial Detention Policy**
The Washtenaw County Prosecutor's Office does not make use of cash bail. Cash bail is a system under which a defendant who has been accused of a crime is required to post money in order to secure release from jail pending trial. Importantly, cash bail forces defendants to pay for their release *before* they have been convicted. In function, cash bail imposes pre-conviction punishment on criminal defendants who cannot afford to pay. [*https://www.washtenaw.org/3288/Cash-Bail-Policy, accessed 12/28/24*]

25.   To justify her request for cash bail as to Mr. Lee, Ms. Doe represented to the Court that she had authorized a new complaint (felony warrant for a different alleged crime) against Mr. Lee that very day.

26.   Relying on that representation, Judge Simpson remanded Mr. Lee into custody (jail) at 11:43 AM. He asked Ms. Doe to expedite the swearing of the new complaint, and Ms. Doe replied that she had contacted a Washtenaw County Deputy Sheriff Court Officer to do so.

27.   About an hour later, that Deputy appeared before the Hon. Magistrate Elisha Fink to swear out the new complaint against Mr. Lee. However, Magistrate Fink declined to do so.

28.   The Deputy informed Ms. Doe that the new complaint was declined by Magistrate Fink, due to alleged deficiencies in the allegations supporting probable cause for the new arrest warrant against Mr. Lee. He did so while Ms. Doe was still in Judge Simpson's courtroom handling probable cause conferences.

29.   Ms. Doe and the Deputy discussed correcting the perceived deficiencies and presenting the complaint to Magistrate Fink the next day.

30.   Despite learning that the new warrant request against Mr. Lee was declined, Ms. Doe never informed Judge Simpson or otherwise attempted to correct the information she had presented earlier that day, to justify a cash bond against Mr. Lee.

31.     The Deputy was unable to present the new complaint against Mr. Lee to Magistrate Fink the next day (Friday, September 27) because she was not on the bench. He was not going to be able to present it until the next business day, Monday, September 30, and he informed Ms. Doe of this.

32.     When the Deputy presented the complaint to Magistrate Fink on September 30, 2024, she refused to authorize a new warrant, citing a lack of probable cause.

33.     The Deputy informed Ms. Doe of this result by 11 AM that same day. Ms. Doe again failed to notify Judge Simpson or his staff.

**Mr. Ganatra Learns of Ms. Doe's Conduct and Notifies the Court**

34.     Later on the afternoon of September 30, Ms. Doe told one of her supervisors that Magistrate Fink had rejected the complaint, but she did not reveal that Mr. Lee was in custody because of her representations to the court, nor that she never notified the court that the new complaint had been rejected.

35.     Mr. Ganatra learned that the new complaint had been rejected. He determined that Judge Simpson, as well as Judge Anna Frushour (the chief judge of the 14th District Court), should be notified of these circumstances. Judge Simpson was upset when he learned, in open court, what had happened.

36.     On October 2, Mr. Ganatra and other supervisors within the Prosecutor's Office learned for the first time that Mr. Lee was still in custody from Thursday, September 26 through Wednesday, October 2, only because of Ms. Doe's representation to the Court that a new complaint was being expeditiously sworn against Mr. Lee, and her subsequent failure to notify the Court that the new complaint was declined by the Magistrate.

37.     Michigan Rule of Professional Conduct 3.3, which governs ethical responsibilities of attorneys, states at Rule 3.3 ("Candor Toward the Tribunal") that

> (a) A lawyer shall not knowingly:

> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; …

38.     The above circumstances were related to Mr. Savit and Ms. Burton-Harris, but on information and belief, Ms. Doe did not receive any consequences for these actions.

## Ms. Doe Expresses An Intent To Withhold Evidence In A Potential Murder Case, *People v. Fareed Hajjar*

39.     On July 12, 2024, Ms. Doe authorized a felony warrant against Mr. Fareed Hajjar, arising from a death investigation from a body found "dumped" in Northfield Township, in northern Washtenaw County.

40.     The Northfield Township Police Department officers and Ms. Doe reviewed the matter for a possible murder charge against Mr. Hajjar. However, the body had decomposed so badly that the Washtenaw County Medical Examiner was unable to make a definitive finding regarding the cause and manner of death.

41.     In the meantime, Mr. Hajjar was held on a lesser charge in connection with disposing of the body. That case was pending before Judge Simpson and was scheduled for a preliminary examination on October 21, 2024.

42.     Before that hearing was to be held, Ms. Doe was attempting, through Mr. Hajjar's defense counsel, to have Mr. Hajjar submit to a police-administered polygraph examination.

43.     Also in the meantime, investigators were attempting to compile additional evidence against Mr. Hajjar.

44.     On October 10, officers from the Northfield Township Police Department, along with Ms. Doe, were examining the crime scene where the victim's body was recovered, along with a forensic anthropologist who was searching for a missing bone from the victim's skull. Miraculously, the anthropologist was successful in locating the missing bone fragment, smaller than a pencil, and barely distinguishable from a twig.

45.     A police officer turned on his bodycam video and recorded the incident. At 1:00 in the video, Ms. Doe clearly directs the police officers to not disclose the information about the recovered evidence to Mr. Hajjar's attorney, until after the defendant underwent a polygraph exam, or otherwise agreed to take one.

46.     Such conduct is arguably in violation of the Michigan Rules of Professional Conduct, which at Rule 3.8 sets forth "Special Requirements of a Prosecutor." These include making "timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the degree of the offense," which arises from U.S. Supreme Court precedent.[2]

47.     Such conduct, also, arguably, violates MRCP Rule 3.4 ("Fairness to Opposing Party and Counsel," as well as MRCP Rule 8.4 ("Misconduct"), which includes "conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer."

---

[2] Sometimes called the "Brady-Giglio" doctrine, this ethical rule takes its name from two U.S. Supreme Court cases, *Brady v. Maryland* (1963) and *Giglio v. United States* (1972). In *Brady*, the Court held that prosecutors must disclose exculpatory evidence to the defense. In *Giglio*, the Court extended this duty to include impeachment evidence that could be used to challenge the credibility of prosecution witnesses.

48.     Mr. Ganatra learned of the existence of the bodycam video on or about October 18, from First Assistant Prosecuting Attorney Andrew Childers. After watching the video, they took steps to ensure that Mr. Hajjar's attorney was aware of the recovered bone fragment.

49.     Later that same day, Mr. Ganatra and Mr. Childers met with Ms. Doe to discuss the potential evidence violations apparent on the bodycam video, and to ensure that she subsequently remedied the situation.

50.     Although Ms. Doe promised to advise Mr. Hajjar's attorney of the existence and content of the bodycam video, on information and belief, she did not.

51.     Mr. Ganatra directed another attorney in the office to research the potential for prosecutor liability arising from Ms. Doe's actions; then he and Mr. Childers then informed Ms. Burton-Harris of this issue.

52.     Mr. Savit and Ms. Burton-Harris did not ask to watch the video, though they agreed the Hajjar case would be reassigned to a different assistant prosecutor.

53.     When Ms. Doe learned she was removed from the Hajjar case, she was extremely upset. On or about November 14, she spoke disparagingly about Mr. Childers to another assistant prosecutor, who then made Mr. Ganatra aware of this conversation.

54.     Mr. Ganatra advised Ms. Burton-Harris about Ms. Doe disparaging Mr. Childers to another prosecutor.

55.     On November 15, it was reported to Mr. Ganatra that Ms. Doe had met with Judge Simpson and disparaged a number of people, including colleagues in the Prosecutor's Office. Mr. Ganatra, in turn, advised Ms. Burton-Harris.

56.     That same day, Mr. Ganatra met with Judge Simpson, who confirmed that Ms. Doe had earlier met with him and disparaged a number of people and further claimed there was a conspiracy against her. They discussed the Hajjar case and at Mr. Ganatra's invitation, Judge Simpson viewed the bodycam video where Ms. Doe instructed officers to delay in informing Mr. Hajjar's attorney about the discovery of the bone fragment.

57.     After viewing the video, Judge Simpson advised Mr. Ganatra that he needed to report Ms. Doe's conduct to the Attorney Grievance Commission.

58.     "The Attorney Grievance Commission (AGC) is the investigative and prosecutorial arm of the Michigan Supreme Court for allegations of attorney misconduct. The AGC serves to maintain and promote the integrity of the Bar and to protect the public, the courts, and the legal profession." [*www.agcmi.org, accessed 12/28/24*]

59.     Mr. Ganatra also discussed the Don Lee matter with Judge Simpson, who directed his court staff to make the video discs of the Don Lee court hearings (where Ms. Doe sought a cash bond for Mr. Lee) to Mr. Ganatra. He obtained these videos from Judge Simpson's assistant on November 21.

**Mr. Ganatra Informed His Superiors of his Intent to File a Complaint against Jane Doe with the Attorney Grievance Commission**

60.    Mr. Ganatra informed Ms. Burton-Harris of his meeting with Judge Simpson on November 15, by text and phone. Ms. Burton-Harris told Mr. Ganatra that she agreed with Judge Simpson's recommendation to report Ms. Doe's conduct by filing a grievance with the AGC.

61.    Ms. Burton-Harris appeared supportive at the time. She texted,

> People need to feel safe reporting things without fear. That's important to me.

62.    Ms. Burton-Harris even offered to cosign the grievance along with Mr. Ganatra. They went together to discuss the matter with Mr. Savit.

**Prosecutor Savit Expresses Skepticism About Filing a Grievance**

63.    Mr. Ganatra and Ms. Burton-Harris met with Mr. Savit in his office on November 18. Mr. Ganatra began discussing AGC reporting obligations that require licensed attorneys to report alleged professional misconduct.[3]

---

[3] MRCP 8.3 (a) "Reporting Professional Misconduct," provides that "A lawyer having knowledge that another lawyer has committed a significant violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer **shall** inform the Attorney Grievance Commission." [Emphasis added]

64.     Despite this, Mr. Savit expressed skepticism and asked if Mr. Ganatra had called the State Bar "Ethics Hotline."[4] He also asked if he intended to inform Ms. Doe of what he was doing.

65.     Mr. Ganatra played the bodycam video for Mr. Savit and Ms. Burton-Harris, neither of whom had viewed it previously. Mr. Savit argued with Mr. Ganatra as to whether this was an actual "Brady-Giglio" violation by Ms. Doe, and asked to see the research that he and another prosecutor had compiled.

66.     When Mr. Ganatra suggested to Mr. Savit that he inform his own "Conviction and Integrity Unit" of Ms. Doe's conduct, to preserve the integrity of prosecutions in which she participated, Mr. Savit was noncommittal, and on information and belief, declined to do so.

67.     Mr. Savit again directed Mr. Ganatra to call the Hotline before moving forward. Mr. Ganatra agreed but reaffirmed his intent to file a grievance regardless. He called the Hotline that afternoon and left a message.

68.     Shortly after that meeting, Mr. Savit and Ms. Burton-Harris met with Ms. Doe, and told Mr. Ganatra Ms. Doe was planning to "self-report" to the AGC. Mr. Ganatra informed them that he was still ethically obligated to report Ms. Doe.

---

[4] Also known as the State Bar of Michigan "Ethics Helpline," it is a resource for licensed attorneys to call for "verbal, non-binding, and confidential ethics advice from a staff attorney regarding their own prospective conduct." [https://www.michbar.org/opinions/ethicsopinions#helpline, accessed 12/28/24]

### Mr. Ganatra Confirms His Duty to Report, and Files a Grievance

69.     On November 19, a State Bar Ethics Helpline staff attorney returned Mr. Ganatra's call from the previous day. After discussion, the attorney advised Mr. Ganatra that he was obligated to report Ms. Doe's conduct. The attorney additionally reminded Mr. Ganatra of the special reporting responsibilities that supervisors had over subordinates, as was his relationship to Ms. Doe.

70.     Mr. Ganatra related the Helpline conversation to Mr. Savit and Ms. Burton-Harris via text message. He wrote:



71.     Neither Mr. Savit nor Ms. Burton-Harris responded to this message.

### Defendants Savit and Burton-Harris Turn Against Mr. Ganatra

72.     Shortly after Mr. Ganatra sent the text message advising that he had to report Ms. Doe's conduct, Ms. Burton-Harris entered his office and closed the door. She told Mr. Ganatra that:

- He served at the pleasure of Eli Savit

- She did not want to have a conversation with him like she did with Jane Doe (about not having a place in this office anymore)

- She asked about his retirement date and pension, and asked if he was only continuing to work in the prosecutor's office because of that

- She said that Mr. Savit was upset that Mr. Ganatra had asked another prosecutor to help with ethical research regarding Ms. Doe's conduct, and ordered him to no longer use staff to assist with his grievance

- She said that "Savit is watching you and listening"

- She told him that he was no longer permitted to hold his regular weekly leadership meetings with his team of First Assistants without Savit being present

73.     After that meeting, which Mr. Ganatra justifiably considered to be a veiled threat to his employment, he was not deterred, and still determined to  file the grievance against Ms. Doe.

74.     He met with First Assistant Prosecuting Attorney Andrew Childers and told him that he was advised by the Ethics Hotline to report Ms. Doe's conduct. Childers said that he wanted to co-sign the grievance because he was Ms. Doe's supervisor, and felt that he too had a responsibility to report the conduct to the AGC.

75.     Later that evening, Mr. Ganatra finished drafting the grievance. He sent a copy to Mr. Childers who gave permission for Mr. Ganatra to sign for him.

76.     Mr. Ganatra then phoned his former boss, Brian Mackie, who had been the elected prosecuting attorney for Washtenaw County for 28 years before retiring prior to Mr. Savit's election. Mr. Mackie agreed that Mr. Ganatra was required to report the conduct to the AGC. He cautioned (presciently) that although it was the right thing to do, that Mr. Ganatra was risking his job by filing the grievance.

77.     The next morning, November 20, 2024, Mr. Ganatra took personal time from work to drive the completed grievance to Troy, Michigan and personally hand-deliver it to the Attorney Grievance Commission.

78.     Later that day, he participated in a Zoom "leadership meeting" for all supervisors. Mr. Savit shared that Ms. Doe was placed on administrative duty assisting with warrant review, "because she can no longer appear in front of Judge Simpson … for speaking out of turn about the judge where other people could hear it." He added, "I don't know how much longer she's going to stick around. That's her choice. … Don't want - you don't need any more gossip about this."

79.     On December 3, Mr. Ganatra participated in person for a leadership meeting with Mr. Savit; Ms. Burton-Harris participated by phone.

80.     During that meeting, Mr. Savit stated:

"**Look, there's been too much drama in this office, that frankly, I think is unnecessary.** And I'm not putting the blame for that on this leadership team, exclusively on anybody in particular. Victoria and I bear some blame for it. **Other people in the office bear some blame for it.** Other people in the office have suffered consequences because of it, but this is a leadership team, and what I expect is that we do everything possible to minimize that drama and certainly not to exacerbate it.

"**And to be clear, what that means is we as a group have to make employment related decisions, right?** We have to decide when somebody needs to be disciplined, when somebody is not performing up to our expectations. These are conversations that we have as a leadership team, and it needs to function that way for the office to run smoothly. **However those conversations and what's going on and what we're considering needs to stay within this group.**

"Y'all shouldn't be talking about staff members with other staff members, right? I know rumors are going to fly, and we'll figure out a way to communicate when we need to take action around something, but the gossiping can't come down from this leadership group.

"I'm not saying you have to have everybody that works in this office be your favorite person 100% of the time, but if you need to vent to somebody, go home. Vent to your significant other. Don't go venting to people that are on a parallel level of APA, you know, … or a staff level with the people you supervise. **It's just inappropriate. It stirs up drama in this office. We don't need it.**

"And the other thing is certainly, **do not go outside this office and talk about our internal dirty laundry,** which we sometimes have, right that's inevitable with other members of our legal system, judges or defense lawyers or anything like that. **Let's keep our business in this group, keep our stuff in house,** do everything possible to tamp down the drama, because we have enough actual, meaningful drama out there in the community that we've got to deal with without internal stuff creeping into that. So I really - in the next term, we got to tamp that down, and I think it starts with all you as leaders, setting the example exercising discretion and exercising good judgment about not stirring stuff." [Emphasis added]

81.   After Mr. Savit's ominous remarks, Ms. Burton-Harris added two thoughts of her own – (a) reminding the assistant prosecutors that "we all serve at Eli Savit's pleasure. Period. Do what you will with that." and (b) that "when the top of the office looks good, we're a member of that office, then we all look good."

## Defendants Investigated the Grievance – Not Regarding Ms. Doe's Conduct, but Regarding Mr. Ganatra and Mr. Childers Actions

82.   After receiving a copy of the grievance, Defendants undertook to investigate Mr. Ganatra and Mr. Childers. Their particular focus was a document attached to the grievance ("Attachment 2"), which was a statement from Judge Simpson's judicial coordinator, "AW," concerning Jane Doe and the Don Lee case. It read:

Good afternoon,

Mr. Don Lee was taken into custody by Judge Simpson on 09/26/24 at 11:43 am under the People's representations that Mr. Lee had a new complaint being authorized that same day (WCSO 24-87621).

At 12:31 PM, Magistrate Fink did not find probable cause to sign and issue the complaint and warrant on that same complaint. No notification was sent to this office regarding this matter.

On 09/30/24, the complaint was again in front of Magistrate Fink for the same complaint and again probable cause was not found. Again, no notification was sent to this office.

Sincerely,
[AW]

83.   Ms. Burton-Harris contacted Judge Simpson about the source of that document.

84.     AW and Judge Simpson provided a signed letter, dated December 13, indicating that they searched their email programs and did not find any evidence that the document was ever emailed to anyone, but that it only resided in [AW's] deleted folder as an unsent email.

### Savit and Burton-Harris Confront Mr. Ganatra
### About Attachment 2 to the Grievance

85.     On December 16, 2024, at approximately 1:30 PM, Ms. Burton-Harris summoned Mr. Ganatra and Mr. Childers to Mr. Savit's office.

86.     Ms. Burton-Harris commenced by aggressively asking, with no introduction as to the topic:

> Which one of you did [AW] send the email to that you all used in your grievance against [Jane Doe] that you include as attachment number two, an email from [AW]. Which one of you did she send it to?

87.     Mr. Ganatra replied, "Would have been me."

88.     Ms. Burton-Harris then pressed Mr. Ganatra for details, repeatedly referring to Attachment 2 as an "email" even though the grievance referred to it simply as "notes," and asked at least seven times, "When did she send it to you?"

89.     Mr. Ganatra was clearly uncertain, seeking to clarify which document she was referring to, then eventually stated, "I think that was sent to me sometime in November, probably November 14 or 15. Could have been a Thursday or Friday, I believe, but I'd have to double check."

90.    Mr. Savit and Ms. Burton-Harris then asked Mr. Childers if he reviewed the grievance, and he stated he had.

91.    Ms. Burton-Harris concluded the meeting by stating, "That's all we have for the two of you right now. [Then to Mr. Ganatra] When you get back to your office, I want you to forward me that email that [AW] sent to you. OK?"

92.    Mr. Ganatra went back to his office to look through his thumb drive regarding the AGC complaint for the source material, including Attachment 2.  Ms. Burton-Harris entered his office and closed the door. Mr. Ganatra referenced that he had a paper file, and that his notes in the paper file would reflect where he obtained Attachment 2, but that the paper file was at home and he would have to go home to get it.

93.    Ms. Burton-Harris responded that he would not be permitted to do that and summoned him back to Mr. Savit's office at 1:42 PM.

**Defendants Savit and Burton-Harris Accused Mr. Ganatra of Fraudulent Conduct and Placed Him On Leave**

94.    In the second meeting of December 16, Ms. Burton-Harris began by saying, "When you told us she emailed it to you, you know that's not true." She continued by expressing disapproval of Mr. Ganatra's actions.

95.    She continued: "We should know that with the attorney grievance commission, they've assigned it to an attorney for an investigation for a number of reasons. … And then, if you haven't already when you received [Jane Doe's] response, you'll also see why it is like, **oh shit. What is happening in that office?** We've got to investigate. We also now have that from a judge and his staff suggesting that this was attained fraudulently and that she did not provide it to anybody. That creates a bigger problem." [Emphasis added]

96.    Just as Mr. Savit had done in the December 3 leadership meeting, Ms. Burton-Harris indicated regret that the office's "dirty laundry" was aired for others to see.

97.    She added, "This is a huge problem. It's a fireable offense. It's a grievable offense, and possibly, depending on what happened, a crime. Yeah, this is bad. And I tried, I tried my best to warn you before you went down this road."

98.    Defendants then told Mr. Ganatra that they were "going to get IT [internet technology department] involved" and that he would be placed on leave effective immediately. They directed him to provide a list of cases so that others could cover them. Mr. Ganatra has been on paid leave ever since while Defendants continue to investigate his conduct.

**Here's Defendants' Big Problem**

99.    "Attachment 2" was not fraudulently obtained. It is a public document. It was included in what is called the "bind over packet" for Mr. Lee, which is a packet of documents provided by the court after a criminal defendant is "bound over" after the preliminary examination to circuit court, in preparation for further proceedings, including possible trial.

100.   That bind over packet was presented by the Hon. Joseph Burke at a hearing on October 8, 2024 at which Mr. Lee waived his right to a preliminary examination, to the courtroom staff for further processing.

101.   From there, the bind over packet is scanned by court clerks and placed in the public court record called "Odyssey," viewable by authorized persons, including the attorneys of record (which includes the prosecutor's office).

102.   The screen for Mr. Lee shows the bindover packet received 10/8/24:



[https://tcweb.ewashtenaw.org/attorneys/CaseDetail.aspx?CaseID=431607, accessed 9/30/25]

103.   Clicking on the hyperlink for "Bind Over Packet Received," directs one to this screen:

CASE NO. 24-000859-FH
THE PEOPLE OF THE STATE OF MICHIGAN VS LEE, DON MIGUEL

| Selected Event | Image | Page Count |
|---|---|---|
| 10/08/2024 Bind Over Packet Received | Bind Over Packet Received | 23 |
| | Bind Over Packet Received | 22 |

| Other Events on This Case | Image | Page Count |
|---|---|---|
| 10/08/2024 Protected Personal Identifying Information | Protected Personal Identifying Information | 1 |
| | Protected Personal Identifying Information | 1 |
| 11/20/2024 Stipulated Order | Stipulated Order | 1 |

| Other Images on This Case | Image | Page Count |
|---|---|---|

[https://tcweb.ewashtenaw.org/attorneys/CaseDocuments.aspx, accessed 9/30/25]

104.   Clicking on the hyperlinks above takes an authorized user to the contents of the bind over packet itself, which contains AW's note.

**Defendants Are Well Aware the Note is in the Bind Over Packet**

105.   Just after being notified that he was placed on leave, Mr. Ganatra directed a clerk where to find the note from AW on Odyssey and to print him a copy. Mr. Ganatra then told Mr. Savit the note was from the Don Lee bind over packet, and available on Odyssey.

106. After Mr. Ganatra left the office, Mr. Savit himself asked a different clerk to obtain the bind over packet for him. She did so and explained the process

107. Moreover, a circuit court judge was later able to retrieve the original paper bind over packet from court records, finding it in a pile to be (routinely) shredded. The AW note was in there, and it has since been secured.

108. Finally, on information and belief, Defendants never acted upon their stated belief that they would get "IT" involved to investigate the allegedly fraudulently obtained note, because Mr. Ganatra remained in possession of his work-issued laptop computer and phone, and Defendants never asked for those.

109. Furthermore, on information and belief, an IT investigation would include an IT examination of AW's computer, and that was not done.

110. Finally, on information and belief, an IT investigation involving the above steps would almost assuredly take less than one day. Mr. Ganatra was on leave for six months.

**Defendants Have Shifted Their Rationale and Created A
False Narrative To Justify Keeping Mr. Ganatra on Leave**

111. Confronted with the reality that the AW note was not obtained fraudulently, Defendants had to find a new reason to keep Mr. Ganatra on leave.

112. This new reason was contained in an email authored by Ms. Burton-Harris on December 26, which states in part:

Nimish, however, gave four different stories as to how he had obtained the email. None of those stories were true. I should also note that all of these statements were given confidently and unequivocally.

1. He first stated that [AW] had sent the email to him. When I asked when, he responded "the week of November 14th." I then asked him to procure a copy of the email [AW] had supposedly sent to him. He went back into his office for many minutes, but was unable to procure the email. I then asked him to come back into Eli's office.

2. Upon returning, he changed the story. Contradicting his previous statement, he stated that [AW] had not in fact emailed the relevant message, but instead had physically printed out the email and handed him a hard copy.

3. After we asked about it further, Nimish changed his story again, and stated that he had pulled the email from OnBase. Both he and Eli then spent time looking through all the relevant files in OnBase to try to find the email, to no avail.

4. Finally, Nimish tried to provide yet another story, stating that the email was provided on a disc that he had obtained from the Court which contained video recordings of [Jane Doe] in court. But as I told Nimish, he had not received that disc from the Court until after he had filed the grievance. It would therefore have been impossible for him to have attached an email from that disc to the grievance itself.

113.    Shifting their rationale has not helped Defendants, as their new justification is also a false one.

114.    Concerning "story #1," that Mr. Ganatra allegedly stated that AW sent him the email:

    a.    Mr. Ganatra was responding (unexpectedly) to aggressive cross-examination from Ms. Burton-Harris, who began her questioning by asking "which one of you did [AW] send the email to?" She then repeated that question multiple times, assuming **without foundation** that Attachment 2 was in fact an email. As noted in their grievance, Mr. Ganatra and Mr. Childers simply referred to Attachment 2 as "notes from [AW]."[5]

---

[5] There is a reason why such a question is objectionable in court, because it "assumes a fact not in evidence." "One prominent treatise explains the rule against asking questions that assume facts not in evidence: 'A common vice is for the examiner to couch [a] question so that it assumes as true matters to which the witness has not

b.      Mr. Ganatra never affirmatively stated that AW had emailed him the note. Although he did say "would have been me" in response to the question "Which one of you did [AW] send the email to?" He shortly afterwards clarified, "I don't know which one you're referring to," and "I have to double check," returning to his office to verify.

115.    Concerning "story #2," that Mr. Ganatra allegedly stated that AW "physically printed out the email and handed him a hard copy," this is made up out of whole cloth. At no point in either meeting did Mr. Ganatra make such a statement.

116.    Concerning "story #3," that Mr. Ganatra said he pulled the email from OnBase (the prosecutor's paperless file system), Mr. Ganatra did say that he "pulled it from the computer," mentioning the court's document system. As described above, the document was in the official bind over packet and publicly available on the Odyssey system. That is why the Defendants couldn't find it in OnBase. As described above, Mr. Savit later asked a prosecutor's clerk to find it for him on Odyssey, and she did so readily.

---

testified, and which are disputed between the parties.... [W]hether the witness is friendly or hostile, the answer can be misleading. If the witness answers the question without separating out the assumption, it is impossible to determine whether the assumption was ignored or affirmed." McCormick on Evidence § 7 (5th ed.1999). [Cited in *United States v. Smith*, 354 F.3d 390, 396 (5th Cir. 2003)] At **no point in their grievance** or otherwise did Mr. Ganatra or Mr. Childers assert that AW had emailed him those notes. As such, her letter attesting that she didn't email it is irrelevant, as the printed note was a publicly available court document.

117.    Concerning "story #4," that Mr. Ganatra said the document was provided on a disc that he had obtained from the Court, that is (like story #2) a serious misrepresentation. At no point does Mr. Ganatra say such a thing. What he actually said was, "she gave me a packet of discs and I have to remember if there was an email on that." He later agrees with Ms. Burton-Harris that he did not receive those discs until after filing the grievance, so it is clear he never asserted that he received the AW document from those discs before filing the grievance.

118.    Concerning Defendant's assertion that "all of Mr. Ganatra's statements were given confidently and unequivocally," the complete opposite is true. Mr. Ganatra repeatedly stated that he was unsure of how he obtained the note, and he asked to go home and check his records to verify, without being permitted adequate time to do so.

119.    To believe that Mr. Ganatra obtained the document fraudulently, one would have to believe he would choose to do something illegal and unethical rather than simply obtain it from the bind over packet, which he was authorized to access. It is an absurd and unsupported story.

**Defendants Had No Serious Intention of Learning the Truth**

120.   Defendants have had no serious intention of fairly investigating this matter before taking adverse action against Mr. Ganatra's employment.

121.   As noted above, any responsible investigation conducted by the IT department would have ensured that all devices were secured, obtained, and examined. Defendants never asked for Mr. Ganatra's laptop or phone, yet boldly accused him of fraudulent behavior, committing a fireable offense, a grievable offense, and possibly a crime.

122.   They made the decision to place Mr. Ganatra on leave before ever giving him any kind of fair opportunity to explain where he got the AW document, which had a completely innocent explanation.

123.   The zeal with which Defendants have gone after Mr. Ganatra is in sharp contrast to their indifference concerning the arguably illegal and unethical conduct perpetuated by Jane Doe.

124.   What Defendants have done to Mr. Ganatra, attempting to derail the career of a dedicated and ethical prosecutor for doing the right thing, was prophesized by Defendant Savit when he said at the December 3, 2024 meeting:

> **"And the other thing is certainly, do not go outside this office and talk about our internal dirty laundry."**

125.   Nimish Ganatra paid the price, and now seeks to hold Defendants accountable for their own illegal actions.

**Defendants Retaliated Against Mr. Ganatra By Launching a Bad Faith Investigation After Learning of His Intent to File Suit**

126.   On December 30, 2024, undersigned counsel sent a previous draft of this lawsuit to Defendants' counsel.

127.   On that same date, undersigned counsel sent a Freedom of Information Act request to Defendants' c/o their counsel

128.   On January 28, 2025, Defendants provided a "good faith estimate" of $18,163.53 before they would release any documents subject to that FOIA request.

129.   On January 29, 2025, Mr. Ganatra's professional association, the Assistant Prosecutors Association, sent a letter to Defendants asking for a formal investigation into allegations that Jane Doe's conduct towards her fellow prosecutors (including publicly disparaging them) created a Hostile Work Environment.

130.   On January 29, 2025, Defendants disclosed to undersigned counsel that they have hired an outside law firm (Dykema) to conduct an investigation of Mr. Ganatra. No clear objective to the investigation was stated to Mr. Ganatra.

131.   Defendants asserted that Mr. Ganatra had to comply with the investigation as a condition of his employment, under threat of termination if he did not cooperate.

132.   As such, Mr. Ganatra agreed to participate, but prior to his interview,

undersigned counsel wrote to Defendant's counsel on February 3, 2025:

> Regarding the hiring of Dykema, it has been nearly two months since
> Ms. Burton-Harris told Mr. Ganatra that "We're going to get IT involved to
> help us pinpoint exactly what went on." To date, on information and belief,
> IT has not been significantly involved, and it is my understanding that the
> most pertinent aspect of such an investigation – inspecting [AW's] computer
> – has not been done. Now, only after Mr. Ganatra has submitted a draft
> complaint and a FOIA request, has the County hired outside counsel.
>
> Your clients have already vigorously questioned Mr. Ganatra, and
> despite their insinuations, there is no question that the so-called [AW] memo
> was included in the bindover packet on October 8 when Judge Joseph Burke
> accepted Don Lee's waiver of his preliminary exam, long before Mr. Ganatra
> filed his grievance. Any further interview of Mr. Ganatra is unnecessary,
> misplaced, and again in my opinion, and retaliatory. In any event, please have
> [Dykema] contact me directly to discuss the details of this interview.

133.   Mr. Ganatra was interviewed on February 19, 2025 for approximately

two hours, accompanied by counsel and his Union representatives. Several other

witnesses were interviewed.

134.   The circumstances gave rise to several concerns, including that no

discernible investigation took place until Mr. Ganatra involved counsel.

135.   The Dykema investigation was only announced after the draft

complaint and FOIA request were sent on December 30, 2024, and after extensive

negotiations, the FOIA denial, Union involvement, and the hostile work complaint

and investigation regarding Ms. Doe's conduct. This was a month and a half after

Mr. Ganatra was placed on leave.

136.   Moreover, it was not at all the type of investigation ("involving IT") that Ms. Burton-Harris stated would occur. At no point did Dykema seek to inspect any of Mr. Ganatra's devices, including his work laptop or phone, and on information and belief, their investigation did not include any forensic inspection of any County computers, servers, or devices.

137.   The timing and manner of the Dykema investigation suggests additional evidence of retaliation, only after counsel and the union get involved, and advocated on Mr. Ganatra's behalf.

**Mr. Ganatra Was Returned to Work under Adverse Conditions**

138.   On May 15, 2025, after six months of being on leave, Mr. Ganatra was notified that the Dykema investigation was concluded, with findings that "you did not forge the [AW] email, and there is insufficient proof that you sourced it inappropriately. As such, the investigation findings did not warrant imposing any discipline. Accordingly, your administrative leave is over, and you are expected to return to work on Monday morning, May 19, 2025."

139.   He returned with no official announcement from Defendants, and on coming back, faced additional, multiple adverse employment actions to deprive him of his former duties and responsibilities (see paragraph 17) that marginalized his position as the third highest ranking prosecuting attorney in the office, including:

(a)     No longer being allowed to hold leadership meetings with the First Assistant Prosecuting Attorneys (FAPAs), which he had formerly done on a weekly basis.

(b)     No longer being permitted to coordinate new hire orientation and training with FAPAs, or help them with other meaningful work concerns.

(c)     No longer receiving weekly update reports from FAPAs on their unit, which are now only sent to Mr. Savit and Ms. Burton-Harris.

(d)     No longer being permitted to schedule the case and court assignments of the Assistant Prosecuting Attorneys (APAs), including assignments for preliminary examinations and probable cause conferences.

(e)     No longer permitted to coordinate training of the APAs along with the FAPAs.

(f)     No longer coordinating murder case investigations with FAPAs and APAs.  Completely left out of the discussions.

(g)     No longer being permitted to review and file habitual offender notices on felony cases.

(h)     No longer being permitted to attend preliminary examinations and probable cause hearings.

(i)     Being shunned by Defendant Savit who does not speak with him and will not deal with him, despite Mr. Ganatra's position as the highest ranking prosecutor in the office behind Savit and Ms. Burton-Harris, having been informed by Ms. Burton-Harris that Mr. Ganatra will only deal with her going forward.

(j)     However, Mr. Ganatra is no longer meeting with Ms. Burton-Harris on a weekly basis to discuss office matters regarding the criminal division, as he had been prior to his suspension.

(k)     Despite his extensive trial experience, and his prior assignment as lead prosecutor on three office homicide cases, those were reassigned to other prosecutors during Mr. Ganatra's leave, and the one that is still pending was not reassigned to Mr. Ganatra.

(l)    Being relegated to second chair behind less experienced prosecutors on other homicide cases.

(m)    No longer handling FOIA reviews on Medical Examiner autopsy reports.

(n)    Not being assigned to court for all of June and July 2025, doing little more than being relegated to his office reviewing warrant requests.

(o)    No longer included on Michigan Department of Corrections parole board notifications, despite his twenty-five years of institutional knowledge on many of these prisoners, to provide his perspective on parole applications.

(p)    No longer being permitted to handle general issues from legal clerks, as they relate to the daily operations of the criminal division.

(q)    Essentially being relegated to workplace Siberia while his former duties and responsibilities were assigned to others.

140.    The stripping of his former responsibilities has not been lost on Mr. Ganatra's coworkers and colleagues. Support staff, victim advocates, and attorneys have all commented on his diminished role and limited court appearances.

141.    The above adverse actions are material, significant, and intended to punish Mr. Ganatra for his protected activity.

## LEGAL ALLEGATIONS

### Count I

### Violation of the First Amendment Right to Free Speech Pursuant to 42 USC §1983 (as to Defendant Savit)

142.   Whether Jane Doe's conduct was in contravention of the legal and ethical responsibilities of attorneys in general, and prosecutors in particular, was a matter of public concern.

143.   Mr. Ganatra's expression of intent to file a grievance, and his subsequent filing of one, constituted speech on a matter of public concern.

144.   Given his own experience as a career prosecutor, and seeking counsel from a judge, the Attorney Helpline, and his former boss and elected prosecutor Brian Mackie, Mr. Ganatra's speech and actions were undertaken in good faith.

145.   Mr. Ganatra undertook this speech and the action of filing a grievance on his own time, and with the clear instructions of Mr. Savit and Ms. Burton-Harris (acting on Savit's behest) that he was not to use company time and resources regarding his grievance. Thus his speech was made as a private citizen, and not as an employee pursuant to job duties.

146.   Mr. Ganatra's protected speech caused no material or substantial disruption to the legal and ethical operations of the Prosecutor's Office. If anything, it was Ms. Doe's conduct, and the actions of Defendants, that caused disruption to the operations of the office.

147.    Mr. Ganatra's discharge of his ethical duties to report, in good faith, the arguably unethical and illegal conduct of a fellow employee cannot be held, as a matter of law, to be the cause of material or substantial disruption to the office. When a person discharges an ethical and legal duty, that cannot, as a matter of law or public policy, be tantamount to causing material or substantial disruption.

148.    Defendants made numerous statements and decisions that would chill a person of ordinary firmness from exercising constitutional rights, including having Mr. Savit sit in and watch Mr. Ganatra conduct his supervisors' meetings, making threats, veiled and overt, about employees airing the "dirty laundry" of the Prosecutor's Office to the public, placing Mr. Ganatra on leave, accusing him of fraudulent, unethical, and possibly illegal conduct, launching an arguably bad-faith investigation targeting him after he'd been on leave for two months, continuing his leave for four additional months, and after his return, stripping of his duties as set forth above.

149.    These adverse actions against Mr. Ganatra were retaliation for his exercise of his First Amendment rights.

150.    This retaliation against Plaintiff violated his right to be free from punishment or retaliation for exercising his First Amendment rights, under the 14th Amendment to the U.S. Constitution, codified by 42 USC § 1983.

151.   At all times relevant, Mr. Ganatra had a clearly established right to freedom of speech of which a reasonable public official would have known.

152.   Because Defendant Savit violated constitutional rights about which a reasonable public official should have known, he is not entitled to governmental immunity in either his official or individual capacity.

153.   Defendant Savit, by his conduct, showed intentional, outrageous, and reckless disregard for Plaintiff's First Amendment rights, and acted out of vindictiveness, malice and ill will towards Plaintiff, and bias and animus, with intent to punish Plaintiff for and to deter him from exercising those rights.

154.   As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages as set forth herein and below.

## Count II

### Whistleblowers' Protection Act (Washtenaw County Prosecutor's Office)

155.   The Washtenaw County Prosecutor's Office is a public body as defined by the Whistleblowers' Protection Act, MCL § 15.361.

156.   The Attorney Grievance Commission is also a public body, as it is the prosecutorial arm of the Michigan Supreme Court for attorney misconduct.

157.   Plaintiff engaged in protected activity under MCL § 15.362 when he informed Mr. Savit and Ms. Burton-Harris that he would file a grievance with the AGC against Jane Doe, and then did so.

158.    Defendants was aware of Plaintiff's protected activity.

159.    The Whistleblowers' Protection Act, MCL § 15.362, states that:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

160.    At all relevant times, Plaintiff acted in good faith, sought appropriate counsel, and believed the allegations he was making against Jane Doe were true, and constituted violations of an attorney and prosecutor's ethical and legal responsibilities, notwithstanding that the grievance was eventually dismissed.

161.    Defendant took adverse action against Mr. Ganatra, in violation of the Whistleblowers' Protection Act, when it threatened his employment, placed him on leave, and otherwise discriminated against him regarding his compensation, terms, conditions, location, or privileges of employment.

162.    Defendant took these adverse actions against Mr. Ganatra because of his protected activity, because it knew he was about to report Ms. Doe and did report her, "concerning a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States, to a public body" (the AGC).

163. Defendant's violation of the Whistleblower Protection Act has damaged Plaintiff as alleged herein and below.

## Count III

### Violation of Title VII – Discrimination Race/Color
### (Washtenaw County Prosecutor's Office)

164. Defendant was, at all relevant times, an employer as defined by Title VII of the Civil Rights Act of 1964.

165. Plaintiff was an employee as defined by Title VII.

166. Plaintiff was qualified for his position.

167. Plaintiff is a member of a protected class because of his race/color. He is South Asian and the son of immigrants from India, and is dark skinned.

168. Defendants' actions were plausibly motivated by Plaintiff's race, given the following:

(a) his fellow prosecutor who co-signed the grievance against Ms. Doe, who is white, was not subject to any adverse employment action; and

(b) Ms. Doe, who is also white, and who arguably committed serious ethical violations by misleading a court of law, and by withholding evidence in a potential murder investigation, was not subject to any adverse action except for being placed on "desk duty" for a brief period of time.

169.   But for Plaintiff's race/color, Defendant would not have taken such adverse actions against him.

170.   In the alternative, Plaintiff's race/color was a factor that motivated Defendant's adverse actions against him.

171.   Defendants' discrimination has damaged Plaintiff as stated herein and below.

## Count IV

## Violation of the Elliott-Larsen Civil Rights Act (all Defendants)

172.   At all relevant times, Plaintiff was an employee and Defendants were employers covered by and within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. 37.2201 *et seq.*

173.   Plaintiff was qualified for his position.

174.   Plaintiff is a member of a protected class because of his race/color. He is South Asian and the son of immigrants from India, and is dark skinned.

175.   Defendants' actions were plausibly motivated by Plaintiff's race, given the following:

(a) his fellow prosecutor who co-signed the grievance against Ms. Doe, who is white, was not subject to any adverse employment action; and

(b) Ms. Doe, who is also white, and who arguably committed serious ethical violations by misleading a court of law, and by withholding evidence in a potential

murder investigation, was not subject to any adverse action except for being placed on "desk duty" for a brief period of time.

176.    As such, the adverse actions that Defendants took against Plaintiff were illegally motivated by his race/color.

## DAMAGES

177.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages or will suffer damages as follows:

a.    *Economic Damages* – lost wages, lost earning opportunity, lost promotional and career opportunities, lost value of benefits, attorney fees, incidental and consequential damages.

b.    *Non-Economic Damages* – harm to reputation, emotional distress, mental anguish and continuing mental anguish, denial of social pleasures and enjoyment, inconvenience, embarrassment, ridicule, humiliation, mortification, fear, and outrage.

178.    At all times relevant, Plaintiff has made a good faith effort to mitigate his damages.

179.    The individual Defendants' disregard for Plaintiff's rights was intentional, outrageous, vindictive, and malicious, and warrants the imposition of punitive damages.

## JURY DEMAND

Plaintiff demands a jury trial.

## RELIEF REQUESTED

**W H E R E F O R E**   Plaintiff requests this honorable court grant him:

      a.     damages against Defendants, as warranted by the law and the proofs, including:

          i.     economic and non-economic damages as described above;

          ii.     the greatest possible combination of non-economic and exemplary damages;

          iii.     punitive or special damages as permitted by law;

      b.     costs and pre-judgment and post-judgment interest as permitted by law;

      c.     attorney fees as permitted by law;

      d.     prospective relief, as permitted by law and equity, against Defendant Washtenaw County Prosecutor's Office and the individual Defendant in his official capacity, for reinstatement to his former duties and commensurate relief;

      e.     other remedies as are just, appropriate, and permitted by law or equity.

Respectively submitted,

**ROUMEL LAW**

*/s/ Nicholas Roumel*

Nicholas Roumel
Attorneys for Plaintiff

September 30, 2025